859 So.2d 465 (2003)
Adam DAVIS, Appellant,
v.
STATE of Florida, Appellee.
No. SC00-313.
Supreme Court of Florida.
September 11, 2003.
Rehearing Denied October 31, 2003.
*468 Guillermo E. Gomez, Jr. of Gomez & Touger, P.A., Tampa, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, and Carol M. Dittmar, Senior Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing a death sentence upon Adam Davis. We have jurisdiction. See Art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm both the conviction of first-degree murder and the sentence of death.

FACTS
The evidence presented during Davis's trial revealed the following facts surrounding this case. Prior to June 26, 1998, Davis had been seeing Valessa Robinson, then fifteen years old, for about nine months. Valessa was a troubled teen who had repeatedly run away from home and lived with her mother, Vicki Robinson, who was divorced. In 1997, Ms. Robinson had Valessa evaluated pursuant to the Baker Act.
On June 26, 1998, Davis, then nineteen years old, spent the day running errands with Valessa, Ms. Robinson, and Davis's friend, Jon Whispel. Later that evening, Ms. Robinson had dinner at her house with a friend, Jim Englert. At approximately 11:20 p.m., Davis, Valessa, and Whispel arrived at Ms. Robinson's home. Upon entering, the trio went straight to Valessa's bedroom. Shortly thereafter, Mr. Englert decided to go home, and he inquired if Davis and Whispel needed a ride home. Davis and Whispel declined the offer. They subsequently left on their bicycles and went to Denny's Restaurant, located at Stall Road and Dale Mabry in Tampa. Valessa later snuck out of her house and met Davis and Whispel at Denny's.
Upon Valessa's arrival, the three left Denny's to acquire LSD. They consumed the acid, returned to Denny's, and pondered what they wanted to do next. As they sat at the table, Valessa stated that the three should kill her mother. Although Whispel at first thought Valessa was joking, Davis and Valessa began to discuss ways in which they could kill Ms. Robinson. Davis ultimately suggested that they inject Ms. Robinson with enough heroin to cause an overdose.
The three left Denny's and headed back to Ms. Robinson's house. When they arrived, they stayed outside for a while to ensure that they did not awaken Ms. Robinson. Whispel and Valessa then went inside the house and opened the garage door. Upon returning to the outside, they waited again to ensure Ms. Robinson did not awaken. Valessa then opened the keyless entry to her mother's van and retrieved the set of spare keys. Davis put the car into neutral, and Valessa and Whispel *469 pushed the car out into the street so as not to awake Ms. Robinson.
Davis then drove the trio to a friend's house to purchase the heroin. While inside his friend's house, Davis told his friend that he was looking for enough heroin to kill someone and make it look like an accident. Although Davis was unable to obtain any heroin, he did purchase a syringe.
Davis, Whispel, and Valessa returned to Ms. Robinson's home and parked several houses down the street to avoid waking Ms. Robinson. Once inside the home, Davis suggested that Valessa get some bleach and a glass so that they could inject Ms. Robinson with bleach and an air bubble using the syringe he had purchased. Valessa complied. Davis then filled the syringe with bleach and air, grabbed his folding knife, and he and Valessa headed to Ms. Robinson's bedroom. A few minutes later, Davis and Valessa returned, stating that Ms. Robinson had awakened. Davis put the syringe and the bottle of bleach in Valessa's closet and put his knife on Valessa's dresser. Ms. Robinson knocked on the door and told Valessa to get her sleeping bag and come into her room. Davis handed Valessa her sleeping bag, and Davis followed Ms. Robinson into the hall.
Davis put Ms. Robinson into a "sleeper" hold, attempting to render her unconscious. He then asked for the syringe. Because Valessa did not know where Davis had put the syringe, Davis told Valessa to hold her mother down while he retrieved it. Davis then returned and injected Ms. Robinson with the bleach-filled syringe. While this was happening, Whispel testified that Ms. Robinson was fighting to get up and asking what they were doing to her. A few minutes later, Davis stated that the bleach was not working. At that time, Whispel brought Davis the knife and said "use this." Whispel then returned to Valessa's bedroom. When Davis and Valessa returned to Valessa's bedroom, Davis was holding the knife limply in his left hand, and Whispel noticed blood on Davis's hands and on the knife. Valessa did not appear to have blood on her hands.
Shortly thereafter, the three heard moaning from the kitchen, where the incident had occurred, and Davis commented that Ms. Robinson would not die. Davis then grabbed the knife and left the room. Davis later told Whispel that he stabbed Ms. Robinson two more times and tried to break her neck.
A few hours later, Davis, Whispel, and Valessa cleaned the kitchen with bleach and towels. Davis put Ms. Robinson into a trash can that he had retrieved from the garage. The three loaded Ms. Robinson's van with the towels, the trash can, shovels and a hoe, and drove to a wooded area near Ms. Robinson's home to bury Ms. Robinson. While digging the hole, however, they hit rough terrain, so they instead concealed the trash can with some foliage, planning to come back later.
The three eventually returned to Ms. Robinson's house and obtained Ms. Robinson's credit cards, cash, and ATM card because Valessa knew the personal identification number. Davis, Whispel, and Valessa spent the next three days in Ybor City, using Ms. Robinson's money to get tattoos and stay at motels. They also went to Home Depot and purchased twenty bags of concrete, a bucket, and a trash can, with the intention of dumping the body in a nearby canal.
During the time that the three were in Ybor City, Mr. Englert reported that Ms. Robinson was missing. Davis subsequently learned from a friend that he and Valessa were on the news, so the three decided to go to Phoenix, Arizona. Because they *470 needed to leave quickly, they did not complete their plans with regard to Ms. Robinson's body.
Davis, Whispel, and Valessa remained on or near Interstate 10 during their trip and continued to use Ms. Robinson's ATM card. Upon being notified by the police that Ms. Robinson was missing, Ms. Robinson's credit union began to track the card's usage, as opposed to closing her account. The three were ultimately traced to near Pecos County, Texas, where, after a high-speed chase, they were apprehended. Valessa was taken to a juvenile detention center near Midland, Texas, and Whispel and Davis were taken to Fort Stockton.
Lieutenant John Marsicano and Detective James Iverson, who had been investigating the case in Hillsborough County, arrived in Texas early in the morning on July 3, 1998, the day after Davis, Whispel, and Valessa had been arrested. Because Valessa was being detained closer to the airport, the officers questioned her first. They then drove to Fort Stockton to question Whispel and Davis. In Fort Stockton, the officers first interviewed Whispel. Davis was subsequently questioned around 5:30 a.m. The officers spoke with Davis for approximately eight to ten minutes. The officers then administered Davis's Miranda warnings,[1] obtained a signed written waiver of rights form, and had Davis draw a map indicating where Ms. Robinson's body could be found. At that time, the officers turned on their tape recorder and recorded a confession from Davis. During his confession, Davis described how the murder was planned and committed, including how he had stabbed Ms. Robinson. He also described their activities following Ms. Robinson's death.
A jury convicted Davis of first-degree murder, grand theft, and grand theft of an automobile. The trial court subsequently conducted the penalty phase of Davis's trial, during which both sides presented evidence. The jury recommended by a seven-to-five vote that Davis be sentenced to death. The trial court followed the jury's recommendation and imposed a death sentence, finding and weighing three aggravating factors,[2] one statutory mitigating factor,[3] and four nonstatutory mitigating factors.[4]State v. Davis, No. 98-11873 (Fla. 13th Cir. Ct. order filed Dec. 17, 1999) (sentencing order).
Davis appeals his first-degree murder conviction and the trial court's sentence of death, raising nine issues.[5]
*471 ISSUE 1. MOTION TO SUPPRESS DAVIS'S CONFESSION
Davis argues that the trial court erred in denying his motion to suppress his confession given to Lieutenant Marsicano and Detective Iverson in Texas. During the initial ten-minute discussion with Detective Iverson and Lieutenant Marsicano, Davis stated that he killed Ms. Robinson. Upon hearing this statement, Detective Iverson read a Miranda warning to Davis. Davis then signed a written waiver of his Miranda rights, drew a map indicating where Ms. Robinson's body could be located, and gave a recorded confession. Davis argues that the confession that he gave after waiving his Miranda rights should be suppressed because he had already confessed to killing Ms. Robinson before he was issued a Miranda warning.
A trial court's ruling on a motion to suppress is clothed with a presumption of correctness with regard to the trial court's determination of historical facts. Appellate courts, however, independently review mixed questions of law and fact that ultimately determine constitutional issues arising in the context of the Fourth and Fifth Amendments. Connor v. State, 803 So.2d 598, 608 (Fla.2001). We find that the trial court properly denied Davis's motion to suppress.
In Oregon v. Elstad, 470 U.S. 298, 310-11, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the United States Supreme Court held that a careful and thorough administration of Miranda warnings serves to cure the condition that made an unwarned statement inadmissible. "Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id. at 309, 105 S.Ct. 1285. Therefore, the fact that Davis talked with the detectives about killing Ms. Robinson prior to receiving a Miranda warning does not by itself affect the admissibility of his subsequent confession. We have held in accord with Elstad that a taped statement given after administration of Miranda rights is admissible even though it contains the same information as in an earlier statement made without the giving of a Miranda warning. Davis v. State, 698 So.2d 1182, 1187-89 (Fla.1997).
Davis relies upon this Court's decision in Ramirez v. State, 739 So.2d 568 (Fla.1999), to argue that, like Ramirez, the circumstances surrounding this case are distinguishable from Elstad. We disagree and find that the trial court properly distinguished Ramirez in denying Davis's motion to suppress.
In Ramirez, the defendant had discussed his participation in a crime with police officers prior to being given a Miranda warning. In considering whether the statements given after Ramirez was read his Miranda rights were admissible, this Court applied Elstad. This Court, however, concluded that the circumstances surrounding the statements in Ramirez were distinguishable from Elstad because Ramirez was not given a careful and thorough administration of his Miranda warnings. This Court found that the officers in that case instead employed a concerted *472 effort to downplay and minimize the significance of the Miranda rights, thus exploiting the statements previously made to the officers and tricking Ramirez into not exercising his rights. Ramirez, 739 So.2d at 576. This Court noted that Ramirez had just turned seventeen years old and that the officers in that case lulled the young defendant into a false sense of security that they were not arresting him and did not permit him to contact his parents before questioning. Finally, the officers administered the Miranda rights orally and did not secure a written waiver until after Ramirez had fully confessed to his involvement in the crime. Id. at 577-78. This Court therefore held that Ramirez's confession should have been suppressed.
None of the circumstances that rendered Ramirez's warned confession inadmissible are present in the instant case. We find that, as in Elstad, the circumstances surrounding Davis's warned confession properly "cured" the condition that rendered the unwarned statement inadmissible. Elstad, 470 U.S. at 311, 105 S.Ct. 1285. The officers in this case carefully read Davis his Miranda rights, explaining each section of the waiver form, clearly reading aloud and explaining each right, and confirming after each right that Davis understood. The officers asked Davis to confirm that the officers did not threaten Davis or promise anything in exchange for his statement and thereafter obtained a signed, written waiver of rights. Only after this signed written waiver was obtained did Davis fully explain his involvement in the crime. The officers in no way attempted to downplay the significance of Davis's Miranda rights. Ramirez is therefore inapplicable to the instant case.
Finally, in response to the State's argument that Davis's confession was properly admitted because it was freely given, Davis argues that his taped confession is inadmissible because it was involuntary, citing Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Davis's argument in this respect is premised on the following factors: (1) the officers deceived Davis by informing him that they were investigating a missing person's case when in fact they had information that Ms. Robinson was dead; (2) the officers did not inquire as to whether Davis was injured from the incidents that occurred during his arrest the previous day; (3) the officers did not inquire as to Davis's use of narcotics before he was arrested the previous day; (4) the officers interrogated Davis early in the morning; and (5) an officer stated that it would be worse for Davis in Tampa if he did not tell them what happened.
We find this argument to be without merit. The trial court's findings that there was no cognitive deficit on the part of Davis on the day he spoke with the officers, that Davis was not sleep deprived or otherwise unable to comprehend what was going on, and that the officers adequately explained to Davis the nature of the crime are supported by competent, substantial evidence. The officers in this case informed Davis that they were there to discuss the disappearance of Ms. Robinson and that they had already spoken with Whispel and Valessa Robinson. Moreover, Davis's interview with the officers was approximately fifteen hours after his arrest. Davis remained in a jail cell that entire time until the officers were ready to speak with him. The officers testified that Davis appeared coherent, did not have trouble communicating, and spoke freely. He did not indicate that he was having trouble understanding what was happening. We therefore hold that the trial court properly denied Davis's motion to suppress.
*473 ISSUE 2. CHALLENGES TO VENIREPERSONS FOR CAUSE
Davis asserts that the trial court reversibly erred by denying his motions to strike six venirepersons for cause. In respect to this issue, our caselaw has set out the basis for a trial court to rule upon strikes for cause and the appellate court standard of review. The test upon which the trial court is to determine juror competency is whether the juror can lay aside any bias or prejudice and render his or her verdict solely upon the evidence presented and the instructions on the law given by the court. Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). A juror should be dismissed for cause if the juror's view regarding the death penalty would prevent or substantially impair the performance of his or her duties as a juror in accordance with the court's instructions and the juror's oath. Hertz v. State, 803 So.2d 629, 638 (Fla.2001), cert. denied, 536 U.S. 963, 122 S.Ct. 2673, 153 L.Ed.2d 846 (2002).
In respect to the standard of review, we have recognized that "[i]t is within a trial court's province to determine whether a challenge for cause is proper, and the trial court's determination of juror competency will not be overturned absent manifest error." Id. (quoting Fernandez v. State, 730 So.2d 277, 281 (Fla.1999)). A trial court has latitude in ruling upon a challenge for cause because the court has a better vantage point from which to evaluate a prospective juror's answers than does this Court on a cold review of the record. Id. Therefore, a decision to deny a cause challenge will be upheld if there is competent record support for the trial court's conclusions. Johnson v. State, 660 So.2d 648, 661 (Fla.1995).
Davis first argues that the trial court erred in denying his motion to strike venireperson Pritchett because Pritchett stated that he could not consider mercy in imposing a punishment. The State, however, correctly points out that this is not the basis upon which Davis objected to juror Pritchett for cause in the trial court. At trial, Davis objected to Pritchett on the basis that he had a preconceived idea as to guilt. We conclude from the record that the trial court was within its discretion to deny this challenge for cause on the ground presented. Moreover, it appears from the record that the trial court did allow the asking of questions concerning mercy.
Davis's next assertion is that the trial court erred in denying his motion to strike venireperson Mosier because Mosier indicated that he could not consider mercy in recommending an appropriate penalty. Davis did ask Mosier questions concerning mercy and Mosier stated that mercy was not something he would consider. Davis argues that Mosier should have been dismissed for cause, relying on this Court's opinions in Poole v. State, 194 So.2d 903 (Fla.1967), and Thomas v. State, 403 So.2d 371 (Fla.1981). We do not agree that Poole and Thomas control this decision.
Poole is distinguished on its facts in that it was not a case based upon the present capital sentencing statute. In Thomas, which was based on the present sentencing statute, this Court did hold that the trial court erred in denying a challenge for cause to a juror who unequivocally stated that he could not recommend mercy in a sentencing phase. Thomas, 403 So.2d at 375. However, the venireperson in that case was responding specifically to questioning as to whether he could recommend a life sentence instead of the death penalty if the defendant was convicted of first-degree murder. That juror indicated that he could not consider any mitigating factors, thereby implying that he would not recommend a life sentence. This Court *474 concluded that the juror's strong feelings of bias precluded him from being an impartial juror. Id.
In the instant case, defense counsel did not question venireperson Mosier in this context. Defense counsel generally questioned whether mercy would play a part in his decision as to an appropriate punishment. Mosier's response did not unequivocally indicate that he would not consider evidence of mitigating factors or that he would not recommend a life sentence instead of the death penalty. In fact, Mosier had previously stated that he would be comfortable applying the law and recommending a life sentence if he determined that the mitigating factors proven by the defense outweighed the aggravating factors proven by the State. He further unequivocally stated that he accepted the idea of recommending a life sentence as opposed to death if Davis was convicted of first-degree murder. We do not find on the basis of this record that the trial court abused its discretion in denying Davis's motion to strike venireperson Mosier. Our decision is consistent with our decision in Gore v. State, 475 So.2d 1205 (Fla.1985).
With regard to the remaining four venirepersons challenged by Davis in this direct appeal,[6] Davis argues that each of these venirepersons equivocated when questioned about their feelings on the death penalty and the circumstances surrounding this case. We find, however, that the record supports the trial court's denial of Davis's motions to strike these venirepersons. Each person indicated that they could fairly and impartially consider the evidence presented at trial and apply the law as instructed to them. Each further stated that they could engage in the weighing process and consider the mitigating factors presented by the defense in recommending an appropriate penalty.
ISSUE 3. EXCLUSION OF STATEMENTS MADE BY VALESSA ROBINSON TO DETECTIVES
Davis next argues that the trial court reversibly erred by not permitting Detective Iverson and Lieutenant Marsicano to testify regarding Valessa Robinson's statements made to them. The assertion is that these statements should have been admitted pursuant to section 90.804(2)(c), Florida Statutes (2002),[7] which is the declaration against interest hearsay exception. However, we do not find support in the record for Davis's claim. The entire record upon which this issue is based is the following.
[DEFENSE COUNSEL]: Judge, the reason I've asked to approach the bench at this time is because I want some guidance as to the discretion the Court's going to allow me with respect to questioning Detective Iverson on the specific *475 subject matter is, what type of information I would be allowed to question him about regarding the statements made by Valessa Robinson.
I'm taking the position that Jon Whispel this morning opened the door to the testimony regarding what Valessa Robinson has said about the incident which I think would then allow me to even ask Detective Iverson what she told him about the incident. I didn't want to do that in open court before we talked about it at the bench and have counsel have an opportunity to respond to that, though.
THE COURT: Ms. Williams?
[PROSECUTOR]: Judge, I would object. It's hearsay and I don't know of any exception to that.
THE COURT: I'm not sure how you think Mr. Whispel opened that door.
[DEFENSE COUNSEL]: Well, I think he did, Judge, and let me at least say what my observation was and maybe the Court doesn't remember this the same way I do. I believe right off the bat Jon Whispel testified using hearsay statements thatregarding Valessa, for example, her explanation at the Denny's. Later on he testified regarding Valessa being willing to take the blame for the incident.
[DEFENSE COUNSEL CO-CHAIR]: She stood up and said, "Let's kill my mother."
[DEFENSE COUNSEL]: That comes out by her
[DEFENSE COUNSEL CO-CHAIR]: Statements from her.
[DEFENSE COUNSEL]: He also testified very clearly that Adam Davis and Valessa Robinson entered into a conversation in his presence in which they both said they were going to take the blame for this incident. I think again that opens the door for us to proceed further. It's very, very important to our defense, obviously, because we are not in this alone is our projected position of this, so that's why I'm asking the Court to allow me some latitude here.
THE COURT: I don't think it allows you the latitude to have Valessa's statement put in through this witness or to question him concerning that.
[DEFENSE COUNSEL]: Judge, if the Court is making that ruling then I wish to ask Detective Iverson this: If my client had given him a statement indicating that someone else had done it, would that statement have been consistent with what he's learned from other statements.
THE COURT: If your client had told him someone else had done it?
[DEFENSE COUNSEL]: One of the other three. Obviously, what I want to do is preface this because he even said himselfI don't think there is any violation of any sort. Even Detective Iverson indicated that he took a statement from all three people. By having taken the statement and having an idea I believe I can ask him whether or not all of them admitted they were involved in drugs, all of them made the same kind of statements involving that, I can ask him if they wereif all the statements I believe were consistent in one way or the other. He's going to sayI don't see why I can't ask these questions.
[PROSECUTOR]: Judge, the fact that hearsay is admitted at some time during the trial without objection does not open the door.
THE COURT: Allow you to bring in the additional hearsay. I'm not going to allow you tremendous latitude, but I certainly would ask you to make the appropriate objections.

*476 [PROSECUTOR]: Yes.
[DEFENSE COUNSEL]: So you're not going to let me at least inquire to a certain extent about the statement?
THE COURT: That Valessa made to him?
[DEFENSE COUNSEL]: Well, no. The way I will approach it, given your ruling about what I just asked for is, I would ask Detective Iverson to tell me in ways my client's statement, which I believe I can certainly ask him about, was consistent or inconsistent with that investigation he already acquired from the two statements he took prior to my client's statement. In other words, I would elicit any such testimony directly to, Valessa said this about this, but he might be able to answer in that regard.
THE COURT: No.
[DEFENSE COUNSEL]: You're not going to allow me to do that either?
THE COURT: No, I have no idea what you're asking in that situation so I'm going to ask that you ask the question, I'll allow the State to make the objection. I mean, I can't give you an advisory opinion.
[DEFENSE COUNSEL]: Well, I didn't want to do something in open court without telling you.
[DEFENSE COUNSEL CO-CHAIR]: Tell the Judge what the facts are, what the cold facts are, what you're interested in and then maybe we can get there.
[DEFENSE COUNSEL]: I think the Judge knows what the facts are, Valessa Robinson made a confession to this crime. She admitted she did it.
THE COURT: I understand that, but you arein this case it is hearsay and it's not coming in through this witness.
[DEFENSE COUNSEL]: All right. Judge, having heard your ruling as to my
THE COURT: Let me explain this to you, though, Mr. Traina [defense counsel], I can'tyou can't give me a list of questions and say, "Judge, check off which ones I can ask and which ones I can't."
[DEFENSE COUNSEL]: I'll go ahead. That will be fine, Judge.
THE COURT: I have no way of doing that in the middle of this trial.
[DEFENSE COUNSEL]: I'll go
THE COURT: There's no motion in limine and there's no way for me to give you an advisory opinion on what questions you can ask or not ask in a trial.
[DEFENSE COUNSEL]: No. And don't get me wrong, Judge, nine times out of ten I might just go ahead and ask the witness. I didn't want to create a problem that would later cause
THE COURT: I don't want you to create a problem you know you cannot ask the, question, either but at the point in the middle of this trial with the witness on the stand there's no way we can anticipate every question that you may ask.
[DEFENSE COUNSEL]: Uh-huh.
THE COURT: Okay.
A similar request was made when Lieutenant Marsicano was called as witness.
We agree with the trial court that there was no basis in what was presented to determine whether Detective Iverson or Lieutenant Marsicano could testify as to statements made to them by Valessa Robinson. For statements to be admitted under section 90.804(2)(c), the statements have to meet the requirements of that section. On the bases of the trial record, we find no error by the trial judge in respect to this issue.
*477 ISSUE 4. ADMISSION OF AUTOPSY PHOTOGRAPH
A trial court's ruling on the admission of photographic evidence will not be disturbed absent a clear showing of abuse of discretion. Mansfield v. State, 758 So.2d 636, 648 (Fla.2000). The record in this case indicates that the trial court did not abuse its discretion by admitting into evidence the autopsy photograph of Ms. Robinson.
The autopsy photograph of Ms. Robinson was introduced into evidence to assist the medical examiner in helping the jury understand the nature of her injuries and the difficulty he encountered while attempting to determine her cause of death. This Court has repeatedly upheld the admission of photographs when they are beneficial in explaining a medical examiner's testimony, the manner of death, or the location of the wounds. See, e.g., Floyd v. State, 808 So.2d 175, 184 (Fla.2002); Pope v. State, 679 So.2d 710, 713-14 (Fla.1996); Larkins v. State, 655 So.2d 95, 98-99 (Fla. 1995). The record in this case supports that the photographs were an aid in explaining the examiner's testimony. Further, the trial court allowed the State the admission of only one photograph for this purpose, and that photograph was limited to only the portions of Ms. Robinson's body that the examiner needed assistance in describing. See Floyd, 808 So.2d at 184 ("While a trial court should exercise caution in admitting particularly gruesome photographs, and in limiting their numbers, such photographs may still be relevant."). We find no error.
ISSUE 5. JURY INSTRUCTION REGARDING DISPROPORTIONATE SENTENCES OF CODEFENDANTS AS A MITIGATING FACTOR
Davis contends that the trial court reversibly erred by not specifically instructing the jury that it could consider the disproportionate sentences of the codefendants in this case as a mitigating factor. The trial court, however, permitted Davis to urge the jury to consider the treatment of the other codefendants in determining its recommended sentence, which defense counsel did in fact argue. The trial court instructed the jury using the standard jury instruction, explaining that the jury could properly consider any circumstance that would mitigate the imposition of the death penalty. In Franqui v. State, 804 So.2d 1185 (Fla.2001), this Court found no error in respect to a similar claim:
[W]e find this issue to be without merit. The trial court gave the standard jury instruction on nonstatutory mitigating circumstances, which explains in part that the jury may consider "any other circumstance of the offense" in mitigation. We have held that this standard jury instruction on nonstatutory mitigating circumstances is sufficient, and there is no need to give separate instructions on each item of nonstatutory mitigation. Moreover, ... the trial court specifically informed defense counsel that he could argue codefendants' life sentences as a mitigating circumstance to the jury, which counsel did during closing argument.
Id. at 1196 (citations omitted). We find no error.
ISSUE 6. HEINOUS, ATROCIOUS, OR CRUEL AGGRAVATING FACTOR
Davis next argues that the trial court erred in finding and weighing the heinous, atrocious, or cruel (HAC) aggravating factor. In reviewing a trial court's finding of an aggravating factor, this Court must review the record to determine whether the trial court applied the correct *478 rule of law for each aggravating circumstance and, if so, whether competent, substantial evidence supports its finding. Willacy v. State, 696 So.2d 693, 695 (Fla. 1997). For HAC to apply, the crime must be conscienceless or pitiless and unnecessarily torturous to the victim. The record reveals that the trial court applied the correct rule of law and that competent, substantial evidence exists to support its decision.
In its sentencing order, the trial court found:
The facts of this case include acts perpetrated upon a conscious victim clearly involving foreknowledge of death, extreme anxiety and fear. The victim did not die a quick or painless death. According to the testimony of the co-defendant Jon Whispel, Dr. Lee Miller, and the Defendant's own taped confession, the victim suffered a prolonged, terrifying death, enduring several attempts to kill her.
On the night of the offense, the victim confronted the defendant Jon Whispel, the Defendant, and the victim's own daughter, Valessa Robinson, ... in the daughter's bedroom of the victim's own home. The Defendant followed the victim out and into the kitchen where he placed the victim in a choke hold, almost to the point of unconsciousness. They struggled on the floor and the Defendant called for the victim's daughter to bring him the syringe of bleach while he sat on top of the victim. When she was unable to locate it, she came to the kitchen and held her mother down while the Defendant retrieved the syringe. Upon his return, the Defendant made several attempts to inject the bleach into the victim's neck and finally the needle went into the neck. The two of them continued to hold the victim down waiting for the injection to kill her. After a couple of minutes, the Defendant yelled "It's not working." ... By his own confession, the Defendant stabbed the victim several times, in the neck and in the back. Defendant Whispel heard the victim call out after which the victim's daughter and the Defendant, holding the bloody knife with blood on his hands, return[ed] to the bedroom. The Defendant washed his hands and the three of them began to smoke cigarettes. At that point, they heard the victim moaning. The Defendant responded that "The bitch won't die." He returned to the kitchen, stabbed the victim again and attempted to break her neck.
The medical examiner, Dr. Lee Miller, testified that the victim was alive throughout this event and that her throat was cut. She remained alive and conscious until she lost so much blood that her heart was no longer able to pump.
Sentencing order at 2-3.
The HAC aggravator has been repeatedly upheld where, as here, the victim was repeatedly stabbed and remained conscious during at least part of the attack. Francis v. State, 808 So.2d 110, 134-35 (Fla.2001). The fear and emotional strain preceding the death may also be considered as contributing to the heinous nature of the crime. Id. at 135. We find that the trial court applied the correct law and that its findings are supported by competent, substantial evidence in the record.
ISSUE 7. COLD, CALCULATED, AND PREMEDITATED AGGRAVATING FACTOR
The cold, calculated, and premeditated (CCP) aggravating factor consists of four elements: (1) the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage; (2) the defendant *479 had a careful plan or prearranged design to kill; (3) the defendant exhibited heightened premeditation; and (4) the defendant had no pretense of moral or legal justification. Jackson v. State, 648 So.2d 85, 89 (Fla.1994). CCP can be proven by the circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course. Bell v. State, 699 So.2d 674, 677 (Fla.1997). The record supports the trial court's finding of CCP in this case. In its sentencing order, the trial court found:
The plot to kill the victim was hatched at Denny's Restaurant by [Davis, Whispel, and Valessa]. The victim did not approve of her daughter's relationship with the Defendant, but they wanted to find a way to be together. The plan was to inject the victim with a heroin overdose.
In order to accomplish their plan, the trio left Denny's on their bicycles and returned to the victim's residence. With apparent great caution so as not to wake the victim they pushed the victim's van out of the garage and down the street before they started it up. The Defendant drove and the trio set out to purchase a needle and heroin to kill the victim. Upon attempting to purchase the heroin the Defendant indicated that he wanted the drugs so he could "take someone's ass out." Although unable to obtain the heroin, the Defendant did get a needle. The three of them returned to the victim's home and again in order to avoid detection by the victim they parked the van down the street. They went into Valessa's room to continue to plot the murder. The Defendant instructed defendant Robinson to get some bleach and a glass, which she did and he proceeded to fill the syringe. After waiting enough time to smoke another cigarette, the Defendant and defendant Robinson went to the victim's bedroom to kill her....
The initial plan to kill the victim was thought out to make it appear to be a drug overdose. Notwithstanding that they were unable to obtain the heroin, they modified the plan to use bleach. Then during the actual commission of the murder when the plan failed, the Defendant finally stabbed the victim.
Although prior to the discussion at Denny's there was no plan or talk of murder and taking into account that the defendants claim to be under the influence of LSD prior to and during the discussion of the plan, from that point forward there was a continual course of conduct over several hours that would lead to the death of the victim.
Sentencing order at 3-4.
The record in the instant case reveals a calm, prearranged plan to kill without moral or legal justification. Davis established the plan well in advance of the murder, procured his weapon in advance, and carried out the killing as a matter of course. The trial court did not err in finding the CCP aggravator.
ISSUE 8. DEATH SENTENCE GROUNDED ON BARE MAJORITY OF THE JURY'S VOTE
Davis argues that a death sentence recommended by a bare majority of a jury is unconstitutional. This Court has repeatedly rejected Davis's argument and held that a capital jury may recommend a death sentence by a majority vote. Sexton v. State. 775 So.2d 923, 937 (Fla.2000); Thompson v. State, 648 So.2d 692, 698 (Fla.1994).
ISSUE 9. CONSTITUTIONALITY OF THE DEATH PENALTY
Davis next asserts that Florida's death penalty statute is unconstitutional for several *480 reasons, including the United States Supreme Court's recent opinion in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Each of Davis's arguments regarding the constitutionality of Florida's death penalty statute have been rejected by this Court. See Chavez v. State, 832 So.2d 730 (Fla.2002), cert. denied, __ U.S. ___, 123 S.Ct. 2617, 156 L.Ed.2d 637 (2003).

SUFFICIENCY OF THE EVIDENCE
Although not challenged by Davis, this Court independently reviews the evidence to determine whether sufficient evidence exists to support Davis's first-degree murder conviction. Mansfield v. State, 758 So.2d 636, 649 (Fla.2000). Upon reviewing the record, we find that competent, substantial evidence exists to support the conviction. Davis confessed to the murder of Ms. Robinson, and his confession and the events surrounding the murder are supported by the direct testimony of those involved in this case. No competent evidence was presented to dispute the evidence in support of Davis's conviction.

PROPORTIONALITY REVIEW
Although not raised by Davis in his direct appeal, this Court also reviews the proportionality of each death sentence. Jennings v. State, 718 So.2d 144, 154 (Fla. 1998). To determine whether death is a proportionate penalty, this Court must consider the totality of the circumstances of the case and compare the case with other capital cases. Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). Considering the totality of the circumstances surrounding this case, the aggravating and mitigating factors as weighed by the trial court, and other similar cases, the death sentence imposed upon Davis is proportionate. See, e.g., Cox v. State, 819 So.2d 705 (Fla.2002) (finding death sentence proportionate where court found three aggravating factors, including HAC and CCP, measured against nineteen nonstatutory mitigating factors accorded slight to some weight), cert. denied, 537 U.S. 1120, 123 S.Ct. 889, 154 L.Ed.2d 799 (2003); Connor v. State, 803 So.2d 598 (Fla.2001) (finding death sentence proportionate where court found three aggravating factors, including HAC and CCP, measured against four nonstatutory mitigators); Hauser v. State, 701 So.2d 329 (Fla.1997) (finding death sentence proportionate where victim was strangled and trial court found three aggravators of HAC, CCP, and pecuniary gain, measured against one statutory mitigator and four nonstatutory mitigators).

CONCLUSION
Accordingly, we affirm Davis's conviction of first-degree murder and sentence of death.
It is so ordered.
WELLS, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
ANSTEAD, C.J., concurs in part and dissents in part with an opinion.
PARIENTE, J., dissents with an opinion.
ANSTEAD, C.J., concurring in part and dissenting in part.
I concur in the majority opinion in all respects except for its unelaborated reasoning for rejecting Davis's claim based on Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). As I recently explained in my opinion in Duest v. State, 855 So.2d 33, 52-57, 2003 WL 21467248 (Fla. June 26, 2003), the core principle of Ring is that aggravating circumstances actually relied upon to impose *481 a death sentence may not be determined by a judge alone.[8]
In the instant case, after a bare majority recommendation in favor of death from the jury, the trial judge found three aggravating circumstances: (1) the crime was committed while Davis was on felony probation; (2) the crime was heinous, atrocious, or cruel (HAC); and (3) the crime was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). It is impossible to deny that the judge-found aggravating circumstances were the reason the death sentence was imposed in this case. HAC and CCP are two of the most serious aggravating circumstances set out in our statutory scheme. Larkins v. State, 739 So.2d 90, 95 (Fla.1999).
According to Ring, the Sixth Amendment requires that the factual findings supporting a death sentence must be made by a jury, not a judge. The majority opinion glosses over the Ring decision by stating that all of Davis's arguments have been rejected. This ignores the fact that Florida's sentencing scheme, as written, relies on judges to find the aggravating circumstances necessary to impose the death sentence. As Justice Scalia stated in his opinion in Ring:
We cannot preserve our veneration for the protection of the jury in criminal cases if we render ourselves callous to the need for that protection by regularly imposing the death penalty without it.
Accordingly, whether or not the States have been erroneously coerced into the adoption of "aggravating factors," wherever those factors exist they must be subject to the usual requirements of the common law, and to the requirement enshrined in our Constitution, in criminal cases: they must be found by the jury beyond a reasonable doubt.
Ring, 536 U.S. at 612, 122 S.Ct. 2428 (Scalia, J., concurring). In the instant case, each of the aggravating circumstances used to impose the death sentence was undeniably found by the judge alone. I cannot reconcile Justice Scalia's statements regarding the need for juries to find aggravating circumstances with the majority's rejection of Davis's Ring claim.
PARIENTE, J., dissenting.
I dissent from the affirmance of Davis's murder conviction and sentence of death on two grounds. First, in my view the trial court erred in denying the motion to suppress a confession obtained from this nineteen-year-old defendant shortly after he acknowledged killing the victim during a custodial interrogation administered without Miranda[9] warnings. Second, I conclude that the sentence of death based on a seven-to-five death recommendation violates Davis's right to a unanimous finding of any fact necessary for imposition of the death penalty, and that this defect is not cured by the trial court's finding that the murder was committed while Davis was on felony probation.

*482 EFFECT OF UNWARNED CONFESSION
The State bears the burden of proving by a preponderance of the evidence that a confession is voluntary and thus admissible. See Jorgenson v. State, 714 So.2d 423, 426 (Fla.1998). "[A] determination of the issues of both the voluntariness of a confession and a knowing and intelligent waiver of Miranda rights requires an examination of the totality of the circumstances." Lukehart v. State, 776 So.2d 906, 917 (Fla.2000). Because the ultimate question of voluntariness is a legal rather than a factual question, we review de novo the trial court's determination as to whether a confession was voluntary, and whether the Miranda waiver was voluntary. See Connor v. State, 803 So.2d 598, 606 (Fla. 2001); see also Colorado v. Connelly, 479 U.S. 157, 167-68, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); Ramirez v. State, 739 So.2d 568, 575 (Fla.1999). Applying these principles, I conclude that the State did not establish by a preponderance of the evidence that the confession given by Davis after Miranda warnings was truly voluntary rather than the inadmissible product of the coercive circumstances that resulted in the initial confession during custodial questioning before the warnings were administered.
Relying on Oregon v. Elstad, 470 U.S. 298, 310-11, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the majority in this case holds that the administration of the Miranda warnings and Davis's waiver of his rights to remain silent and to counsel during questioning insulate the subsequent confession from the circumstances that rendered inadmissible the unwarned confession made minutes earlier. In my view, Elstad leads to a different conclusion. In assessing the admissibility of the second confession in Elstad, the Supreme Court distinguished a mere failure to give Miranda warnings from an actual violation of the Fifth Amendment privilege against self-incrimination. The Court stated:
The Miranda exclusionary rule ... serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony. Failure to administer Miranda warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda. Thus, in the individual case, Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.
Id. at 306-07, 105 S.Ct. 1285 (footnote omitted). The Court extended this distinction to a second confession obtained after a full Miranda warning and waiver:
It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.
... When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether *483 that coercion has carried over into the second confession. The failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. Of the courts that have considered whether a properly warned confession must be suppressed because it was preceded by an unwarned but clearly voluntary admission, the majority have explicitly or implicitly recognized that [the] requirement of a break in the stream of events is inapposite. In these circumstances, a careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an "act of free will."
Id. at 309-11, 105 S.Ct. 1285 (citations and footnote omitted) (emphasis supplied).
The eighteen-year-old defendant in Elstad first admitted guilt when he was questioned without Miranda warnings in the living room of his home while his mother was in the kitchen area, a few steps away. After this initial confession, he was taken to the Sheriff's headquarters where, approximately one hour later and after a full warning and waiver of his Miranda rights, he gave a full statement detailing his participation in the crime. Officers made no promises or threats during questioning at either the defendant's residence or the Sheriff's headquarters. See id. at 301-02, 105 S.Ct. 1285. In holding the second statement admissible, the Court stated:
Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative. We find that the dictates of Miranda and the goals of the Fifth Amendment proscription against use of compelled testimony are fully satisfied in the circumstances of this case by barring use of the unwarned statement in the case in chief. No further purpose is served by imputing "taint" to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.

Id. at 318, 105 S.Ct. 1285 (emphasis supplied).
In my view, the majority in this case fails to recognize the distinction drawn in Elstad between merely unwarned and truly involuntary initial confessions. Applying this distinction, I conclude that circumstances calculated to undermine Davis's ability to exercise his free will did in fact accompany the officers' failure to administer Miranda warnings before the initial confession. These circumstances include the following. First and foremost, the interrogation occurred while Davis was jailed far from his home following his apprehension in Texas the previous day. The Court in Miranda recognized the coercive *484 influence of an interrogation while in a setting controlled by police rather than in one's home.[10] Second, the questioning occurred at 5:30 a.m. Tampa time, after Davis was awakened from sleep. Third, the officers deceived Davis by telling him that they were investigating a missing person rather than a murder. Fourth, the officers adopted an informal and ingratiating tone. See Miranda, 384 U.S. at 450, 86 S.Ct. 1602 (referring to tactics of "kindness and stratagems" in questioning suspects). Fifth, an officer intimated that Davis would be in a worse position if he did not admit his involvement. Sixth, Davis was only nineteen years old when he was questioned. Although none of these circumstances alone would render the initial, unwarned confession involuntary, the totality of the circumstances, including the failure to administer Miranda warnings, was sufficient to undermine Davis's ability to exercise his free will, triggering heightened scrutiny as to whether the second, warned statement was truly voluntary or merely the product of the coercive circumstances that resulted in the first statement.
I conclude that the taint created by the first statement, made during custodial questioning without Miranda warnings and in circumstances calculated to undermine Davis's ability to exercise his free will, extends to the ensuing recorded statement given minutes later, after the warnings. Little time passed between the warned and unwarned confessions, there was no change in location, and the identity of the interrogators remained the same. Thus, I conclude that under Elstad, admission of Davis's confession violated his Fifth Amendment privilege against compelled self-incrimination.
The distinction drawn in Elstad between an unwarned statement that merely runs afoul of the requirements of Miranda and one that actually violates the Fifth Amendment privilege against self-incrimination also distinguishes this case from Davis v. State, 698 So.2d 1182 (Fla.1997), on which the majority relies. In Davis, a police officer told an incarcerated defendant who started to make statements about the crime for which he was charged that he would have to reinitiate contact with police before discussing the case because he had asked for a lawyer. When the defendant said he could not afford an attorney, the officer told him the State would provide one. The defendant then confessed. See id. at 1189. This Court suggested that because the defendant was not read "his Miranda rights as they are usually set forth, ... it would be easy to conclude that a formal reading of the Miranda warnings was unnecessary." Id. Despite finding no evidence of an involuntary confession, this Court concluded that the admission of the unwarned statement violated Miranda's creation of a "prophylactic rule intended to ensure that the uninformed or uneducated in our society know they are guaranteed the rights encompassed in the warnings." Id. (first emphasis added). This Court concluded that the error was harmless *485 based on the defendant's subsequent waiver of Miranda after a full warning and an ensuing voluntary confession conveying the same information. See id.
The majority errs in applying Davis to this case for several reasons. First, Davis concerned the admissibility of the initial, unwarned statement, not the admissibility of the second statement as in this case. Second, Davis involved a de minimis violation of Miranda rather than the overbearing circumstances that included the failure to administer Miranda warnings present in this case. These distinctions lead me to conclude that our 1997 decision in Davis does not support the majority's disposition of the issue here.
The majority in this case distinguishes this Court's decision in Ramirez v. State, 739 So.2d 568 (Fla.1999), on the grounds that in this case, unlike Ramirez, the Miranda warnings that separated the defendant's two confessions were administered clearly, conscientiously, and with no attempt to downplay the significance of the rights being waived. This Court in Ramirez interpreted Elstad as holding that "if a `careful and thorough administration' of the Miranda warnings are later given, and the Miranda rights are waived, the condition that `rendered the unwarned statement inadmissible' is `cure[d].'" Id. at 574 (quoting Elstad, 470 U.S. at 311, 105 S.Ct. 1285). This statement in Ramirez accurately encapsulates only one aspect of Elstad's holding. It does not reflect the stricter scrutiny applied by Elstad to a second, warned statement when the first, unwarned statement is the product of coercive or overbearing circumstances, as in this case. See Elstad, 470 U.S. at 310-11, 105 S.Ct. 1285. Because the unwarned confession in this case was the product of circumstances that undermined Davis's ability to exercise his free will, the test is whether the compulsion caused by these circumstances taints the second confession obtained after the Miranda waiver. See id. at 310, 105 S.Ct. 1285. Under this standard, I would hold both confessions inadmissible.
Because I cannot conclude beyond a reasonable doubt that the jury would have found Davis guilty of first-degree murder had it not been exposed to the second confession, I conclude that the murder conviction should be reversed and the case remanded for a new trial. Cf. Ramirez, 739 So.2d at 578 (reversing conviction based on inability to find erroneous admission of confession harmless beyond a reasonable doubt).

NONUNANIMOUS ADVISORY SENTENCE
In the alternative to reversal of the murder conviction, I would vacate the sentence of death based on the lack of a unanimous jury finding on any aggravating circumstance necessary for imposition of the death sentence and on the fact that none of the aggravating circumstances found by the trial court rely solely on the fact of a prior conviction.
As I have previously stated, in my view the right to jury trial contained in article I, section 22 of the Florida Constitution, interpreted in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requires a unanimous jury finding that an aggravating circumstance exists before the death penalty may be imposed. See Butler v. State, 842 So.2d 817, 835 (Fla.2003) (Pariente, J., dissenting). Under Florida's death scheme and the standard penalty-phase instructions, a unanimous advisory sentence of death necessarily connotes a finding of the existence of an aggravating circumstance, satisfying Ring and article I, section 22. Here, however, *486 the jury recommended death by a bare majority of seven to five.[11]
Under Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), on which Ring is based, the requirement that the jury find any fact necessary to increase an authorized sentence does not apply to the bare fact of a prior conviction. In this case, the trial court found three aggravating circumstances: the murder was committed while on felony probation, HAC, and CCP. Only the first of these aggravators involves a prior conviction. Section 921.141(5)(a), Florida Statutes (2002), provides: "The capital felony was committed by a person previously convicted of a felony and under sentence of imprisonment or placed on community control or on felony probation." By its own terms, the aggravator required a finding by the sentencing judge not only that Davis was previously convicted of a felony, but that he was on probation for that felony at the time of the murder. Thus, the prior-conviction exception of Apprendi does not insulate Davis's sentence from the requirement of a unanimous finding of an aggravating circumstance necessary to impose the sentence of death. Accordingly, I dissent from the affirmance of the sentence of death.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The aggravating factors were: (1) the crime was committed while Davis was on felony probation; (2) the crime was heinous, atrocious, or cruel; and (3) the crime was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
[3] The statutory mitigating factor was the defendant's age at the time of the crime (little weight).
[4] The nonstatutory mitigating factors were: (1) Davis was under the influence of LSD at the time of the offense (some weight); (2) Davis had no prior convictions for assaultive behavior (some weight); (3) Davis had a deprived childhood and suffered hardships during his youth (some weight); and (4) Davis is a skilled writer and artist and can be expected to make a contribution to the prison community by sharing his knowledge, skills, and experience (some weight).
[5] Davis claims that (1) the trial court erred by denying Davis's motion to suppress statements that he made to the officers during his interview in Texas; (2) the trial court erred by denying Davis's motions to strike venirepersons for cause; (3) the trial court erred by excluding the confession of codefendant Valessa Robinson; (4) the trial court erred by admitting an autopsy photograph of Ms. Robinson; (5) the trial court erred by refusing to specifically instruct the jury that the disproportionate sentences received by Davis, Whispel, and Valessa Robinson may be considered as a mitigating factor; (6) the trial court erred by finding the heinous, atrocious, or cruel aggravating factor; (7) the trial court erred by finding the cold, calculated, and premeditated aggravating factor; (8) imposing a death sentence grounded on a bare majority of the jury's vote is unconstitutional; and (9) Florida's death penalty scheme is unconstitutional.
[6] The remaining venirepersons challenged by Davis were venirepersons Whitman, Eustace, Junda, and Lopez.
[7] Section 90.804, Florida Statutes, provides in pertinent part:

(2) HEARSAY EXCEPTIONS.The following are not excluded under s. 90.802, provided that the declarant is unavailable as a witness:
. . . .
(c) Statement against interest.A statement which, at the time of its making, was so far contrary to the declarant's pecuniary or proprietary interest or tended to subject the declarant to liability or to render invalid a claim by the declarant against another, so that a person in the declarant's position would not have made the statement unless he or she believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is inadmissible, unless corroborating circumstances show the trustworthiness of the statement.
[8] The majority cites Chavez v. State, 832 So.2d 730 (Fla.2002), as providing an explanation for why we may reject the defendant's Ring claim. However, the only discussion of the Ring decision in Chavez was an unelaborated reference to the fact that the Court had addressed "a similar contention" in the plurality opinions in Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002), and King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002), and denied relief. See Chavez, 832 So.2d at 767. Thus, Chavez provides no guidance for why rejection of the defendant's Ring claim is appropriate.
[9] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[10] The Court quoted a police instruction manual:

If at all practicable, the interrogation should take place in the investigator's office or at least in a room of his own choice. The subject should be deprived of every psychological advantage. In his own home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior within the walls of his home. Moreover his family and other friends are nearby, their presence lending moral support. In his office, the investigator possesses all the advantages. The atmosphere suggests the invincibility of the forces of the law.
Miranda, 384 U.S. at 449-50, 86 S.Ct. 1602 (quoting Charles E. O'Hara, Fundamentals of Criminal Investigation 99 (1956)).
[11] In a concurring opinion in Way v. State, 760 So.2d 903, 924 (Fla.2000), I identified Florida as being "in a small minority of jurisdictions with a statute that allows the imposition of the death penalty even though the jurors' vote is less than unanimous." In Ring, the United States Supreme Court named Florida, Alabama, Indiana, and Delaware as the four states having hybrid death schemes involving both judge and jury in the sentencing process. See 536 U.S. at 608 n. 6, 122 S.Ct. 2428. In Alabama, a jury recommendation of death, which reflects a finding of the existence of at least one aggravating circumstance, requires the vote of at least ten jurors. See Ala.Code § 13A-5-46(f) (2002). Indiana requires a unanimous jury finding of the existence of at least one aggravating circumstance to support a death recommendation, and in legislation passed since Ring, now also requires special verdict forms on aggravating circumstances. See Overstreet v. State, 783 N.E.2d 1140, 1161 (Ind.2003) (citing to Ind.Code § 35-50-2-9(d), amended by P.L. 117-2002 § 2). Delaware changed its capital sentencing law shortly after the Ring decision and now prohibits a death sentence in the absence of a unanimous jury finding beyond a reasonable doubt of the existence of at least one aggravating circumstance. See 73 Del. Laws 423 (2002) (amending Del.Code Ann. tit.11, § 4209(4)(e)(1)). Thus, of the four hybrid states identified in Ring, Florida is now the sole jurisdiction in which the jury can determine that an aggravating circumstance exists, and thereby recommend death, by a bare majority vote.