PER CURIAM.
Joshua Lee Altersberger appeals his conviction and sentence for the first-degree murder of Florida Highway Patrol Sergeant Nick Sottile.[1] For the reasons stated below, we affirm his conviction and sentence.
I. BACKGROUND
Late in the morning of January 12, 2007, the Defendant drove to a friend’s home in Highlands County. Also at the home was Quentin Kinder, who was in Florida to avoid arrest for violating his Georgia probation. After drinking and playing video-games, Altersberger left the home with Kinder. Kinder testified that, at this point, Altersberger was not so affected by the alcohol that his speech was impaired but was “buzzing a little bit.”
Later that afternoon, around 3:00 p.m., Altersberger drove with Kinder to a restaurant in Lake Placid in an effort to meet a girl whom he believed to be working there. Upon learning that the girl was not at work, Altersberger drove with Kinder to a nearby convenience store so that he could buy a cigar. As Altersberger and Kinder were walking out of the store, the two noticed a deputy sheriff in a marked patrol car stopped at a red light. Kinder then heard Altersberger state, as though he was speaking to the deputy, “You better not stop me or I’m going to shoot you.”
Altersberger left the store with Kinder and drove north on Highway 27 out of Lake Placid. Altersberger’s driving was aggressively erratic, and he swerved several times in and out of heavy afternoon traffic. At one point, Altersberger had to swerve in the midst of a lane change in order to avoid striking another car. This attracted the attention of Florida Highway Patrol Sergeant Nick Sottile who had been travelling in the opposite direction and who turned to pursue.
Kinder saw Sergeant Sottile turn around and notified Altersberger. Altersberger responded by saying that he was going “to push it,” or speed up to flee. Kinder told Altersberger not to try to flee and also said that, because of his Georgia probation violation, he was going to run from the car once Altersberger pulled over. As he was pulling over, Altersberger cut sharply from the left lane across the right lane, cutting off and nearly striking a semi truck. And, as Altersberger pulled off the roadway, he stated to Kinder that he was going to shoot Sergeant Sottile. Kinder told Altersberger not to shoot the officer, and then got out of the car and ran into a nearby orange grove.
Intending to complain to Sergeant Sot-tile about Altersberger’s driving, the semi truck driver pulled over behind the trooper’s patrol car. The truck driver then got out of his truck and walked toward Sergeant Sottile, who ordered him back to his truck. From the elevated cab of his semi truck, the driver was able to observe the events that followed.
Sergeant Sottile approached Altersber-ger’s driver’s side window with his hand resting on his gun. Altersberger raised his hands as Sottile approached and kept them raised while he spoke with Sottile for a short time. Sottile, appearing to be *125 more comfortable with the situation, took his hand from his gun. After Sottile took his hand off his gun, Altersberger lowered his hands and pulled a gun. Sergeant Sottile raised his hands and started to back away from Altersberger’s window when Altersberger shot him. Sergeant Sottile was hit near his left collar bone and fell backward to the ground. Altersberger then reached out the window of his car to aim his gun at Sergeant Sottile and tried several times to shoot him in the head, but his gun would not fire. Altersberger then rapidly drove away. Sergeant Sottile died shortly thereafter as a result of internal bleeding from the gunshot wound.
Altersberger pled guilty to first-degree murder on March 13, 2009. At the penalty phase, the State presented testimony regarding the murder of Sottile. The defense presented laywitness testimony of Altersberger’s mother and aunt, one of his mother’s friends, and the testimony of former teachers and health department employees who remembered Altersberger as a child. These witnesses testified that Al-tersberger had an impoverished and unstable upbringing and a history of anger problems. They also testified that his mother had very poor parenting skills, did not make good decisions regarding the men that she brought around her children, did not treat or discipline Altersberger appropriately, and did not display affection toward him.
Altersberger also presented the testimony of two mental health experts. The first, Dr. Krop, a forensic psychologist, testified that Altersberger has anger issues that stem from his dysfunctional relationship with his mother and the insecurity caused by her poor parenting and decision-making throughout his childhood. Dr. Krop also explained that, despite his 103 IQ, Altersberger has problems -with planning and impulse control and was extremely immature for his age, both socially and developmentally. Dr. Gur, a neuropsy-chologist who specializes in neuroimaging, testified that the orbital frontal and amyg-dala regions of Altersberger’s brain are significantly undersized and that such a condition would result in impaired ability to control and regulate emotions and impulses, an impairment that would be exacerbated by drug and alcohol use or abuse. However, Dr. Gur stated that, because he had never met Altersberger and was not familiar with the facts of the case, he could not connect his findings to the crime itself.
The jury recommended the death penalty by a vote of nine to three. After a Spencer[2] hearing, the trial court followed the jury’s recommendation and sentenced Altersberger to death. In so doing, the trial court found the following aggravators: (1) the victim was a law enforcement officer engaged in the lawful performance of his official duties (great weight);. and (2) the murder was committed in a cold, calculated, and premeditated manner (CCP) without any pretense of moral or legal justification (great weight). The trial court also found the following mitigators: (1) Altersberger was 19 years old at the time of the murder (slight weight); (2) Altersberger’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (moderate weight);[3] *126 (3) the offense was committed in an unsophisticated manner (very, very slight weight); (4) Altersberger was under the influence of alcohol at the time of the offense (little weight); (5) Altersberger had a long-term history of substance abuse from age 15 (very slight weight); (6) Al-tersberger was brought up in a dysfunctional family and home environment (moderate weight); (7) Altersberger loves and is valued by his family (very slight weight); (8) Altersberger loved his grandfather and was devastated by his death (very slight weight); (9) Altersberger was the victim of racial discrimination within his own family (little weight); (10) Altersberger maintained good behavior throughout the proceedings (very slight weight); and (11) Altersberger plead guilty and took responsibility for the offense (little weight). In weighing the aggravators and mitigators and determining death to be the appropriate sentence, the trial court specifically stated “that the aggravating circumstances in this case far outweigh the mitigating circumstances” and that “either aggravating circumstance alone would outweigh all of the mitigating circumstances.”
II. ISSUES ON APPEAL
On appeal, Altersberger argues that the trial court erred in finding the CCP aggra-vator.[4] We also review whether Altersber-ger’s plea was knowingly, intelligently, and voluntarily made and whether his death sentence is proportionate. As explained below, none of these issues warrants relief.
A. Cold, Calculated, and Premeditated
Altersberger argues that the trial court erred in its finding that Sergeant Sottile’s murder was cold, calculated, and premeditated. We disagree.
“A determination of whether CCP is present is properly based on a consideration of the totality of the circumstances.” Hudson v. State, 992 So.2d 96, 116 (Fla.2008) (citing Wike v. State, 698 So.2d 817, 828 (Fla.1997); Lynch v. State, 841 So.2d 362, 372 (Fla.2003)). However, this Court’s review of a determination of CCP is limited “to ensuring that the trial court applied the correct rule of law and, if so, that there is competent, substantial evidence to support its findings.” Caballero v. State, 851 So.2d 655, 661 (Fla.2003). To support a finding of CCP, the following four elements must be established: (1) the killing must have been “the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold);” (2) the defendant must have “had a careful plan or prearranged design to commit murder before the fatal incident (calculated);” (3) the defendant must have “exhibited heightened premeditation (pre- *127 meditated);” and (4) the defendant killed without any “pretense of moral or legal justification.” Gill v. State, 14 So.3d 946, 962 (Fla.2009) (quoting Franklin v. State, 965 So.2d 79, 98 (Fla.2007)).
“The ‘cold’ element generally has been found wanting only for ‘heated’ murders of passion, in which the loss of emotional control is evident from the facts.” Looney v. State, 803 So.2d 656, 678 (Fla.2001) (quoting Walls v. State, 641 So.2d 381, 387-88 (Fla.1994)). Indeed, we have previously found murders in which a defendant devises a plan to catch a police officer off guard prior to killing the officer to satisfy the cold element. See Jackson v. State, 704 So.2d 500 (Fla.1997) (upholding the CCP aggravator as applied to a defendant who, as she was being arrested and placed into a police car, deliberately dropped her keys so as to force her arresting officer to bend over to retrieve them and to thereby give her the opportunity to pull her gun and carry out an execution-type murder by fatally shooting the officer in the head).
Here, the testimony describing the calm, deliberate nature of Altersberger’s statements and actions clearly support the trial court’s finding that the murder of Sergeant Sottile was “cold.” Altersberger twice calmly announced his intent to shoot a police officer if he were to be pulled over. Testimony also established that, as Sergeant Sottile approached Altersberger’s car, Altersberger raised his hands and feigned compliance up until Sottile was lulled into being comfortable enough to take his hand away from his gun, giving Altersberger the opportunity to shoot. At that point, Altersberger shot Sergeant Sot-tile when Sottile had his hands raised and was backing away from Altersberger’s vehicle. These actions demonstrate that Al-tersberger had the opportunity to calmly reflect upon his decision to shoot any officer who might pull him over and also demonstrate that Altersberger devised and carried out a plan to catch Sergeant Sottile off guard and then kill him.
To establish the “calculated” element, the evidence must show that the defendant “had a careful plan or prearranged design to commit murder before the fatal incident.” Gill, 14 So.3d at 962 (quoting Franklin, 965 So.2d at 98). Again, in Jackson, we determined that the calculated element is established where the defendant devises and carries out a plan to catch a police officer off guard in order to shoot the officer. Jackson, 704 So.2d at 504-05. We have similarly found the murder of a police officer to be “calculated” where the defendant stated that if he “were pulled over by the police, he would get out and shoot because he was not going back to jail” and then stated, as his car was being pulled over, “that he was not going back to jail,” prior to exiting the car, exchanging gunfire with two officers, and fatally shooting one. Griffin v. State, 639 So.2d 966, 971-72 (Fla.1994) (quoting trial judge’s findings).
Here, the evidence supports a finding that, similar to Jackson and Griffin, Al-tersberger had a prearranged design to shoot a police officer if he were to be pulled over. Altersberger twice expressed this intent prior to the shooting. And Altersberger’s actions in carrying out the shooting, specifically his raising his hands and feigning compliance so as to catch Sottile off guard, also demonstrate his prearranged design to commit murder. Accordingly, we find that the evidence supports the trial court’s determination that the murder of Sergeant Sottile was “calculated.”
“We have previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and *128 not commit the murder, but, instead, commits the murder.” Alston v. State, 728 So.2d 148, 162 (Fla.1998) (citing Jackson, 704 So.2d at 505). Here, testimony established that Altersberger had the opportunity to leave the crime scene without committing murder — he could have continued to comply with Sergeant Sottile during the course of what could have remained an ordinary traffic stop — but instead chose to carry out his prearranged design to catch Sergeant Sottile off guard and then shoot him. Further evidence of Altersberger’s heightened premeditation is the testimony that, after he had already shot Sergeant Sottile, Altersberger reached out his car window and attempted several times to shoot Sergeant Sottile in the head. See Rodriguez v. State, 753 So.2d 29, 46 (Fla. 2000) (noting that a defendant’s purpose in firing an additional shot into victims’ heads was to “ma[k]e certain that the victims were dead”). Because Altersberger chose to commit murder when he could have left the crime scene without so doing, the heightened premeditation requirement for CCP is established. See Lynch, 841 So.2d at 378 (citing Alston, 723 So.2d at 162); see also McCoy v. State, 853 So.2d 396, 408 (Fla.2003).
Altersberger does not contest the final element required to sustain the CCP ag-gravator — that the murder was committed without any legal or moral justification— and has not posited “any colorable claim ... that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.” Nelson v. State, 748 So.2d 237, 245 (Fla.1999) (quoting Walls v. State, 641 So.2d 381, 388 (Fla. 1994)). Regardless, this element is clearly established, as the record is entirely devoid of evidence that could be used to argue that Altersberger had any excuse, justification, or defense for shooting Sot-tile.
Accordingly, we affirm the trial court’s finding that the CCP aggravator applies to the murder of Sergeant Sottile.
B. Knowing, Intelligent, and Voluntary Plea
This Court reviews “the record of a death penalty case to determine whether the evidence is sufficient to support the murder conviction.” Winkles v. State, 894 So.2d 842, 847 (Fla.2005); see also Davis v. State, 859 So.2d 465, 480 (Fla.2003). However, where the death penalty is imposed after a defendant has pled guilty to a first-degree murder charge, “this Court’s [mandatory] review shifts to the knowing, intelligent, and voluntary nature of that plea.” Barnes v. State, 29 So.3d 1010, 1020 (Fla.2010) cert. denied, — U.S.-, 131 S.Ct. 234, 178 L.Ed.2d 155 (2010) (quoting Tanzi v. State, 964 So.2d 106, 121 (Fla.2007)). This Court “scrutinize^] the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and pled guilty voluntarily.” Winkles, 894 So.2d at 847 (quoting Ocha v. State, 826 So.2d 956, 965 (Fla.2002)).
On March 11, 2009, the trial court held a Nelson[5] inquiry after Altersberger moved to discharge his attorneys on the grounds that they were improperly attempting to force him to plead guilty. During the hearing, Altersberger acknowledged that his attorneys had discussed with him the importance of prevailing at the penalty phase and had explained to him that entering a plea would be a good strategic decision. But Altersberger stated that he still felt that his attorneys would not fight for him and only wanted him to plead. Ultimately, the court denied *129 Altersberger’s motion because there was nothing presented to indicate that counsel was ineffective or had performed incompetently.
Two days later, on March 13, 2009, Al-tersberger pled guilty to first-degree murder. During the plea colloquy, Altersber-ger stated that he had not been forced or coerced and had not been promised anything in exchange for his plea and said that he understood the consequences of his plea and the rights that he was forfeiting. He further stated that he also understood that he faced one of two possible penalties, that a penalty phase jury would recommend whether he be sentenced to life without parole or death, and that the judge was required to give great weight to the jury recommendation.
Before accepting Altersberger’s plea, due to his earlier motion to dismiss his attorneys, the judge inquired further about whether Altersberger felt pressured by his attorneys into pleading guilty. Altersber-ger told the judge that he had been fully advised by his attorneys that pleading guilty would be in his best interest and that he did not feel that he had been forced or pressured into his plea. Alters-berger also stated that he was pleading guilty because, in his words, “I just feel that it’s time for me to man up and take care of my responsibilities” and that the decision to plead guilty was “my choice[a]nd I made that choice.” After hearing a factual basis from the state, the trial court accepted Altersberger’s plea.
After being sentencing to death, Alters-berger, with conflict-free counsel, moved to withdraw his guilty plea, arguing that he was misled and given mistaken advice by counsel prior to entering the plea. A hearing was then held during which Al-tersberger testified that his attorneys had pressured him into pleading guilty through the use of scare tactics and by setting up a meeting with his mother at the jail so that she could recommend that he plead guilty. Altersberger claimed that his plea had not been voluntary and that his answers and statement at the plea colloquy were made at the direction of his attorneys because he believed that he had no other choice. Al-tersberger also stated that, prior to sentencing, he wanted to withdraw his plea, but his attorneys stated that it would be better if he were to wait until after sentencing. Altersberger claimed that, had he known of the appeals that he was waiving from a potential guilt phase, he would not have pled guilty.
Altersberger’s attorneys testified that they knew the prosecution had as many as twenty witnesses who could provide highly damaging testimony as to Altersberger’s acts and admissions following the shooting and that this testimony would make obtaining a life sentence extremely difficult. They believed, therefore, that the best trial strategy was to agree with the prosecution that Altersberger would plead guilty in return for the prosecution not calling those witnesses at the penalty phase. They also explained that when Altersber-ger asked them what his odds of getting a life sentence would be, they told him that they could not guarantee anything, but his chances would greatly improve if he were to enter a plea -so as to limit the prosecution’s introduction of evidence at the penalty phase. As to his desire to withdraw his plea prior to sentencing, Altersber-ger’s attorneys testified that they explained Altersberger’s rights regarding plea withdrawal and advised him against withdrawing the plea but would have filed the motion to withdraw the plea if they had been directed to do so. Finally, Al-tersberger’s attorneys stated that they had helped Altersberger with language for a statement he wanted to make about accepting responsibility for the murder but *130 that the language he ultimately used was entirely his own.
Altersberger’s motion to withdraw his plea was denied. In its order, the trial court explained that, based on the testimony given by Altersberger and his attorneys,
[i]t is clear that the Defendant in agreement with his attorneys made a tactical decision that it was in his best interest in the hopes of obtaining a life sentence to enter a plea of guilty and proceed directly to the penalty phase. It was fully explained to the defendant at the plea colloquy what the consequences were of entering a guilty plea and what constitutional rights he was giving up.... It is likely that the decision to enter a guilty plea was a difficult decision for the Defendant to make, but the decision was ultimately made by the Defendant knowingly and without coercion.
We conclude that Altersberger’s plea was knowingly, intelligently, and voluntarily made. The trial court conducted a lengthy plea colloquy during which Alters-berger stated that he understood the consequences of his plea, the constitutional rights that he was giving up, and the fact that he would either receive life without parole or the death penalty. Because of Altersberger’s earlier motion to discharge his attorneys, the trial court lengthily inquired into whether Altersberger had been forced or coerced into entering his plea. Altersberger stated that he had not been forced to plead guilty and that he was not promised anything in return for his plea. Most notable, however, is Altersberger’s personal statement, “I just feel that it’s time for me to man up and take care of my responsibilities” and that the decision to plead guilty was “my choice [a]nd I made that choice.” As his attorneys testified, Altersberger wished to make the preceding statement to the trial court, and the statement was entirely his own and did not contain the language that his attorneys had suggested.
Accordingly, we hold that Altersberger’s plea was knowingly, intelligently, and voluntarily entered.
C. Proportionality
Regardless of whether the defendant raises the issue, “[t]his Court must review the proportionality of a death sentence.” Bolin v. State, 869 So.2d 1196, 1204 (Fla.2004). The death penalty is intended for those cases in which “the most aggravating and least mitigating circumstances exist.” Terry v. State, 668 So.2d 954, 965 (Fla.1996). This Court’s review “is not a comparison between the number of aggravating and mitigating circumstances.” Crook v. State, 908 So.2d 350, 356 (Fla.2005) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). Rather, this Court considers the totality of the circumstances to determine if death is warranted in comparison with other cases in which the death penalty was upheld. Davis v. State, 859 So.2d 465, 480 (Fla.2003).
Here, Altersberger was convicted of a premeditated killing of a Florida Highway Patrolman. The jury recommended death by a vote of nine to three. The trial court found two aggravating circumstances beyond a reasonable doubt: (1) the murder was committed in a cold, calculated, and premeditated manner (CCP) (great weight); and (2) the victim was a law enforcement officer engaged in the lawful performance of his official duties (great weight). The trial court also found the following mitigators: (1) Altersberger was 19 years old at the time of the murder (slight weight); (2) Altersberger’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (moderate weight); (3) the offense was *131 committed in an unsophisticated manner (very, very slight weight); (4) Altersberger was under the influence of alcohol at the time of the offense (little weight); (5) Al-tersberger had a long-term history of substance abuse from age 15 (very slight weight); (6) Altersberger was brought up in a dysfunctional family and home environment (moderate weight); (7) Altersber-ger loves and is valued by his family (very slight weight); (8) Altersberger loved his grandfather and was devastated by his death (very slight weight); (9) Altersber-ger was the victim of racial discrimination within his own family (little weight); (10) Altersberger maintained good behavior throughout the proceedings (very slight weight); and (11) Altersberger pled guilty and took responsibility for the offense (little weight).
This Court has found the death penalty to be a proportionate sentence in cases where the totality of the circumstances is similar to those present here. See, e.g., Wheeler v. State, 4 So.3d 599 (Fla.2009) (death sentence proportionate as to defendant who fatally shot sheriffs deputy where trial court found the CCP (great weight), avoid arrest (great weight), and prior violent felony (some weight) aggrava-tors, statutory mitigator that murder was committed under extreme mental and emotional disturbance (some weight), statutory mitigator that capacity to conform conduct to law was substantially impaired (some weight), and eleven nonstatutory miti-gators, including life-long paralysis); Bailey v. State, 998 So.2d 545 (Fla.2008) (death sentence proportionately applied to defendant who fatally shot police officer during traffic stop where trial court found avoid arrest (great weight) and felony probation (great weight) aggravators, the statutory age mitigator (very little weight), and eight nonstatutory mitigators including low IQ (little weight), history of mental illness (little weight), and intoxication at time of offense (little weight)); Burns v. State, 699 So.2d 646 (Fla.1997) (upholding death as proportionate sentence as applied to defendant who wrestled gun away from and then shot victim police officer where trial court found single merged aggravator, based on the murder having been committed to avoid arrest and hinder law enforcement, (great weight) outweighed the statutory age and lack of criminal history mitigators, and three categories of non-statutory mitigators); Reaves v. State, 639 So.2d 1 (Fla.1994) (death sentence affirmed for shooting death of police officer where trial court found two “strong” ag-gravators of prior violent felony and avoid arrest and three “weak” nonstatutory miti-gators). Accordingly, we conclude that the death penalty is proportionate here.
III. CONCLUSION
For the reasons expressed above, we affirm Altersberger’s conviction and sentence of death for the first-degree murder of Sergeant Sottile.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. Spencer v. State, 615 So.2d 688 (Fla. 1993).

. The trial court merged the following non-statutory mitigating circumstances into this one statutory mitigator: (1) Altersberger did not fully develop emotionally; (2) Altersber-ger did not fully develop cognitively; (3) Al-tersberger has brain deficiencies that reduce his ability to control impulse behavior; (4) Altersberger has brain deficiencies that reduce his capacity to make reasoned decisions; (5) Altersberger suffered significant emotional deprivation while he was growing up that *126 adversely affected his psychological development; and (6) Altersberger’s dysfunctional family life prevented healthy psychological development. The court then explained that it gave each mitigator slight weight, individually, but moderate weight when merged and considered collectively.

. Altersberger, for preservation purposes, also argues that (1) the use of hearsay evidence during the penalty phase violates the Confrontation Clause; (2) Florida's death penalty statute violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (3) Florida’s death penalty statute and jury instructions unconstitutionally shift the burden of proof to the defendant to show why death is not the appropriate sentence; (4) the CCP aggravator is unconstitutionally vague and overbroad; (5) victim impact evidence violates defendant’s due process rights; and (6) execution by lethal injection is unconstitutional. We reject each of these arguments as contrary to this Court's well established precedent. See Baker v. State, 71 So.3d 802, 823-24 (Fla.2011) cert. denied,-U.S.-, 132 S.Ct. 1639, 182 L.Ed.2d 238 (2012); Serrano v. State, 64 So.3d 93, 115 (Fla.2011); Schoenwetter v. State, 931 So.2d 857, 877 (Fla.2006); Fotopoulos v. State, 608 So.2d 784, 794 (Fla. 1992).

. Nelson v. State, 274 So.2d 256 (Fla. 4th DCA 1973).