# Supreme Court of Florida

_____

No. SC19-1851
_____

**DONALD H. DAVIDSON JR.,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

July 8, 2021

PER CURIAM.

Donald H. Davidson Jr. appeals his judgment of conviction of first-degree murder and sentence of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm in all respects.

## BACKGROUND

In September 2014, Davidson was conditionally released from prison, meaning that he was still subject to the Department of Corrections' (DOC) supervision even though he no longer resided in

prison. As a condition of his supervised release, Davidson was required to wear a GPS monitor on his ankle.

On the morning of December 1, 2014, Davidson left his job early, complaining to his employer that he felt ill. Davidson called James Earls, his stepbrother, asking to be picked up from a restaurant near Davidson's work. As requested, Earls picked Davidson up and dropped him off at the home of Roseann Welsh and Michael Scott, longtime friends of Davidson. Welsh was home, but Scott and their two children—R.S. and M.S.—were not.

Welsh invited Davidson into the home. After being in the home for some time, Davidson requested to be shown a video game in Welsh's bedroom, and Welsh agreed. While in the bedroom, Davidson put Welsh in a chokehold, forced her face-first into the bed, pulled her dress over her head, and began trying to rape her.

While Davidson was attempting to rape Welsh, 10-year-old M.S. arrived home from school. Hearing the arrival of the school bus, Welsh broke away from Davidson and ran into the adjoining bathroom, but Davidson followed her there. In the bathroom, he located a shoe and removed the lace from it. He then used that lace to strangle Welsh in the shower until she lost consciousness. He

"lean[ed]" her down to the floor.  Realizing that she was still breathing, Davidson stabbed her in the throat three times with a buck knife.

After killing Welsh, Davidson emerged from the bedroom, encountering M.S. in the kitchen.  He grabbed her by the neck, threw her against the couch, and started to sexually assault her. Davidson told her to remove her clothing and suck his penis.  She complied.

While the assault was ongoing, M.S.'s thirteen-year-old brother, R.S., returned home from school.  Davidson turned his focus to R.S., whom he met at the front door.  He told R.S. that his sister and mother were not at home.  Though somewhat skeptical of Davidson's statement, R.S. left the home in search of his sister and mother.

After R.S. left, Davidson removed his GPS ankle monitor, forced M.S. into the family's minivan, and drove away.  As he was driving, Davidson threw out his cell phone through an open window and directed M.S. to duck down when they passed by other vehicles.  While in the minivan, Davidson again sexually assaulted M.S. by fondling her vagina, placing his penis in her mouth, and

placing his penis in or around her anus and vagina. Eventually, he returned to a location near M.S.'s home, allowed her to exit the minivan, and then began driving to Georgia.

Meanwhile, after failing to locate his sister and mother, R.S. returned home. While looking through the home, R.S. found his deceased mother in her bedroom. He then called 911 and reported that his mother was dead, stating: "[S]he's bleeding in her mouth and eyes."

Police responded to the home and began an investigation, which included searching the home for physical evidence, speaking with Scott, and interviewing R.S. Based in part on the information learned from Scott and R.S., police issued a BOLO[1] for the stolen minivan.

Moments later, while still at the scene, police officers observed M.S. approaching the home. Officers took her to a police station where Detective Ryan Ellis interviewed her. Among other things, M.S. told him that she heard her mother yell something about calling 911 as she was arriving home from school. According to

---

1. BOLO stands for "Be on the Lookout."

M.S., Davidson physically and sexually assaulted her in her home, kidnapped her, stole the minivan, and sexually assaulted her again in the stolen minivan.

After her interview with Detective Ellis, M.S. was interviewed and examined by a child protective investigator (CPI). M.S. again recounted the details of Davidson's sexual assaults against her. Additionally, M.S. stated that her buttocks and neck were hurting from the assaults.

In the early morning hours of December 2, police officers located and stopped the stolen minivan. Inside the vehicle, police officers found and apprehended Davidson. After Davidson was taken to a police station interview room, Detective Wes Smith advised him of his *Miranda*[2] rights, which he acknowledged and waived. Then Detectives Smith and Dwayne Singletary interviewed Davidson.

During the interview, Davidson confessed to committing several crimes. He acknowledged attempting to rape Welsh, murdering Welsh by strangling and stabbing her, sexually

---

2. *Miranda v. Arizona*, 384 U.S. 436 (1966).

assaulting M.S. both in her home and in the minivan, and kidnapping her. He also told the detectives that he ingested cocaine a short time before arriving at Welsh's home.

Ultimately, the State charged Davidson with nine crimes, including first-degree premeditated murder, kidnapping, and multiple counts of sexual battery upon a child twelve years of age or younger. Based on the charge of first-degree murder, the State filed a notice of intent to seek the death penalty.

Davidson filed numerous motions, including one that challenged the constitutionality of the prior-violent-felony aggravator.[3] He argued that this aggravator was overbroad and vague—both facially and as applied—rendering the entire death-penalty statute constitutionally infirm. Following a hearing, the trial court rejected Davidson's argument.

At a subsequent hearing, Davidson expressed his intent to plead guilty to first-degree murder (and the other charged crimes) and waive a penalty-phase jury. After a lengthy colloquy with Davidson and the presentation of a detailed factual basis by the

---

3. *See* § 921.141(6)(b), Fla. Stat. (2019).

prosecutor, the court accepted the guilty plea—finding it to be "knowingly, freely, voluntarily, and intelligently given."

At the ensuing penalty-phase hearing, the State introduced numerous exhibits, including: (1) the judgment and sentence for Davidson's aggravated-battery conviction for assaulting a pregnant female in 2010, (2) Davidson's police interview, (3) M.S.'s interview with Detective Ellis, (4) R.S.'s 911 call, (5) a stipulation that Davidson was declared a sexual predator in 2005, and (6) a stipulation that Davidson was on conditional release at the time of the murder.

In addition, the State called eight witnesses. One such witness was Dr. Valerie Rao, the medical examiner who performed the autopsy of Welsh. According to Dr. Rao, Welsh died from asphyxiation—due to strangulation—and the stab wounds to her neck. Detectives Ellis and Smith also testified, discussing their involvement in the investigation and relaying facts gleaned from the interviews.

The victim of Davidson's 2010 aggravated battery provided details about Davidson's attack against her. According to the victim, Davidson entered her home under false pretenses, grabbed

her neck, lifted her off the floor, and squeezed her neck so tightly that she blacked out. After she lost consciousness, Davidson began removing her clothing. She regained consciousness and ran from Davidson. Though he pursued her, she was able to escape.

After the State rested, the defense presented mitigating evidence. This evidence included the testimony of three experts: Dr. Erin Bigler, Dr. Robert Ouaou, and Dr. Steven Gold.

Dr. Bigler is a clinical neuropsychologist and cognitive neuroscientist, who reviewed scans of Davidson's brain. She made two significant findings. One, the "overall white matter volume in Mr. Davidson's brain was on the low end of average . . . [which] can have implications for how the brain is functioning." Two, a PET scan showed metabolic differences in the cerebellum and orbitofrontal portions of Davidson's brain. Dr. Bigler declined to comment on the significance of this latter finding.

Dr. Ouaou, a neuropsychologist, reviewed numerous records and administered neuropsychological tests on Davidson. Based on the records, test results, and Dr. Bigler's report, Dr. Ouaou concluded that, at the time of the murder, Davidson was under the influence of a mental or emotional disturbance and that his ability

to conform to the law's requirements was substantially impaired due to brain damage and cocaine use.

Dr. Gold, a psychologist, discussed Davidson's adverse childhood experiences (ACEs). He explained that Davidson's background included the following ACEs: "childhood physical abuse, childhood physical neglect, childhood emotional neglect, childhood sexual abuse, parents separated or divorced, mother treated violently, . . . a household member going to prison, . . . childhood verbal abuse[,] [and a chaotic] household." He opined that the ACEs on their own or in combination with trauma "over-activate [the] part of the brain responsible for emotionality and impulsivity [and cause] . . . the part of the brain that cur[bs] emotional expression [and] impulses . . . [to be] underdeveloped and underactive." Those changes cannot be altered, Dr. Gold explained, absent significant intervention which was not present in Davidson's background. Ultimately, however, Dr. Gold refrained from offering an opinion as to Davidson's mental or emotional state at the time of the crimes or his ability to comply with the law.

Ten lay witnesses also testified in support of the defense case. In broad terms, their testimony established that Davidson's

upbringing was chaotic and difficult. Davidson's father abandoned the family while Davidson was young, leaving the mother (who was poor) to raise Davidson and Earls without him. Davidson lived in a dirty home, sometimes lacking electricity and running water. He frequently went hungry and routinely slept on the floor or couch. Additionally, Davidson lived "from time to time" in the same household as two uncles who had been prosecuted for sexual offenses. In addition, Davidson was sexually abused as a child by an older cousin and later by Earls. Aside from the sexual abuse, some of Davidson's relatives physically or emotionally abused him, at least to some extent. For example, Davidson's great-grandmother occasionally slapped him on the face, hard enough to leave red marks; two of his cousins and one uncle sometimes beat him up; Earls picked on him; and one of his aunts would occasionally "whip" him. As for academics, Davidson did poorly in school, never obtaining a high school diploma. In addition, Davidson suffers from several health issues, experienced hallucinations as an adult, and has been diagnosed with ADHD.

Following the penalty-phase hearing, the parties submitted sentencing memoranda. In arguing for the death penalty, the State

relied on five aggravating circumstances, including that Davidson had committed prior violent felonies. For his part, Davidson asked the court to find two statutory mitigating circumstances—he was under the influence of an extreme emotional disturbance at the time of the murder and his ability to conform to the requirements of the law was substantially impaired. As for nonstatutory mitigating circumstances, Davidson contended that he established more than seventy such circumstances.

At the *Spencer*[4] hearing, the defense introduced several exhibits,[5] presented additional argument, and read into the record the proposed mitigators. Additionally, the defense read a written statement prepared by Davidson. In that statement, Davidson expressed remorse and regret for what he did to Welsh, Scott, M.S., and R.S.

Thereafter, the court held a sentencing hearing where it pronounced a sentence of death for the first-degree murder of

---

4. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

5. These exhibits included Davidson's medical and educational records, brain scans, disability records, Dr. Ouaou and Dr. Bigler's demonstrative slides, and childhood photographs of Davidson.

Welsh. In the sentencing order, the trial court found five aggravating factors to be proven beyond a reasonable doubt, with the noted weight: Davidson committed the murder while under a sentence of imprisonment for a felony (great weight); Davidson committed prior violent felonies consisting of the 2010 aggravated battery, as well as the sexual batteries on and kidnapping of M.S. (great weight); Davidson murdered Welsh after attempting to commit a sexual battery upon her (great weight); the murder was especially heinous, atrocious, or cruel (great weight); and Davidson committed the murder after having been designated a sexual predator (moderate weight).

As for mitigating circumstances, the trial court rejected the substantial-impairment mitigator, relying on Davidson's "own admissions" and his post-murder efforts to conceal his wrongdoing. In so concluding, the court discounted Dr. Ouaou's contrary opinion. Nevertheless, as to the other proposed statutory mitigator, the court found that Davidson committed the murder while under the influence of an extreme emotional disturbance. But the court assigned only some weight, stressing that the disturbance "was exacerbated by his voluntary ingestion of cocaine."

In addition, the court addressed all proposed nonstatutory mitigating circumstances, grouping them into several categories: childhood upbringing; childhood abuse; educational background; mental health, drug use, and behavioral issues; remorse; and miscellaneous. Under the headings childhood upbringing and childhood abuse, the court found fifteen mitigating circumstances to which it assigned various weight. These circumstances included the following: Davidson's father abandoned him at a young age (little weight); Davidson was raised by a single mother, and she was very poor (little weight); Davidson lived with two uncles, both of whom were prosecuted for sexual offenses (little weight); Davidson and Earls thought that incestuous relations were normal when they were young (some weight); and Davidson lived with numerous violent relatives who abused him and one another (some weight). The court also recognized as mitigating Davidson's poor scholastic performance and mental-health issues, assigning weight ranging from slight to some.

Ultimately, the court concluded that the aggravating circumstances heavily outweighed the mitigating circumstances,

thereby warranting imposition of the death penalty. Davidson now appeals.

## ANALYSIS

Davidson raises three issues for our review. First, Davidson asserts that the trial court committed fundamental error by not finding beyond a reasonable doubt that sufficient aggravating circumstances existed and that those aggravating circumstances outweighed the mitigating circumstances. Next, he contends that the trial court erred in rejecting the substantial-impairment mitigator and abused its discretion in assigning too little weight to certain nonstatutory mitigating circumstances. Finally, Davidson argues that the prior-violent-felony aggravator is unconstitutional.[6] Though not raised by Davidson, we must also determine whether

---

6. The State raises the issue of the comparative proportionality of Davidson's death sentence. However, after the briefing in this case, we decided *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020). In *Lawrence*, we held that the conformity clause in article I, section 17 of the Florida Constitution prohibits us from undertaking comparative proportionality review. *Id.* at 550-52. Thus, in accordance with *Lawrence*, we do not review the comparative proportionality of Davidson's death sentence.

Davidson's guilty plea was knowingly, intelligently, and voluntarily entered.[7]

## Sufficiency of Findings

For his first argument, Davidson assails as fundamental error the trial court's failure to find beyond a reasonable doubt that sufficient aggravating circumstances existed and that those circumstances outweighed the mitigating circumstances. We disagree.[8]

Davidson's argument rests upon the faulty premise that the sufficiency and weighing determinations of section 921.141 are subject to the beyond-a-reasonable-doubt standard. Our recent case law is inconsistent with that premise. For example, in *Rogers v. State*, 285 So. 3d 872, 885 (Fla. 2019), we rejected the argument "that the trial court erred in failing to instruct the jury that it must determine beyond a reasonable doubt whether the aggravating factors were *sufficient* to justify the death penalty and whether

---

7. *See Altersberger v. State*, 103 So. 3d 122, 128 (Fla. 2012).

8. This issue involves a pure legal matter and is thus subject to de novo review. *See Anderson v. State*, 291 So. 3d 531, 533 (Fla. 2020) (citing *Khianthalat v. State*, 974 So. 2d 359, 360 (Fla. 2008)).

those factors *outweighed* the mitigating circumstances." (Emphasis added.)  We explained that "these determinations are not subject to the beyond a reasonable doubt standard of proof."  *Id.* at 886.  Since *Rogers*, we have consistently held the reasonable-doubt standard inapplicable to either the sufficiency or weighing determination.  *See, e.g., Craft v. State*, 312 So. 3d 45, 57 (Fla. 2020); *Santiago-Gonzalez v. State*, 301 So. 3d 157, 177 (Fla. 2020); *Bright v. State*, 299 So. 3d 985, 998 (Fla. 2020); *Doty v. State*, 313 So. 3d 573, 577 (Fla. 2020); *Lawrence*, 308 So. 3d at 552 n.8.  Davidson has not presented a compelling argument to recede from our precedent.

### Mitigation

Davidson presents two challenges to the trial court's handling of mitigating evidence: one directed at the rejection of the substantial-impairment mitigator and the other assailing the weight assignment for certain nonstatutory mitigators.  We find no merit in either challenge.

In his first challenge, Davidson argues that the trial court's rejection of the substantial-impairment mitigator lacks evidentiary support.  However, we have upheld rejection of the substantial-

impairment mitigator where a defendant "took logical steps to conceal his actions from others." *Snelgrove v. State*, 107 So. 3d 242, 260 (Fla. 2012) (quoting *Zommer v. State*, 31 So. 3d 733, 750 (Fla. 2010)). This is so because "[logical] steps constitute 'purposeful actions . . . indicative of someone who knew those acts were wrong and who could conform his conduct to the law if he so desired.'" *Id.* (second alteration in original) (quoting *Hoskins v. State*, 965 So. 2d 1, 18 (Fla. 2007)).

Here, Davidson took several logical steps to conceal his murder of Welsh and flee from her home. For example, Davidson lied to R.S. to keep him from entering the home; Davidson cut off his GPS tracking device; Davidson stole the family's minivan to facilitate his escape; and, while in the minivan, Davidson discarded his cell phone to avoid being tracked and directed M.S. to duck down so that others could not see her. This conduct constitutes competent, substantial evidence supporting the trial court's rejection of the substantial-impairment mitigator—notwithstanding the testimony of Davidson's experts. *Cf. Bright*, 299 So. 3d at 1006-07 (upholding the rejection of the substantial-impairment mitigator based on the defendant's purposeful actions, which consisted of

fleeing from the scene of the murder and hiding the murder weapon); *Ault v. State*, 53 So. 3d 175, 187 (Fla. 2010) (upholding the trial court's rejection of the same mitigator based on the defendant's purposeful post-murder conduct); *see also Colley v. State*, 310 So. 3d 2, 16 (Fla. 2020) ("Even expert evidence can be rejected if that evidence cannot be reconciled with other evidence in the case." (citing *Bright*, 299 So. 3d at 1006-07)).[9]

Davidson also argues that rejection of this statutory mitigator is inconsistent with the trial court's acceptance of seven nonstatutory mitigating circumstances concerning his mental health. This argument also lacks merit. Of note, Davidson fails to explain how acceptance of those mitigating circumstances inevitably leads to the conclusion that he was substantially impaired at the time of the murder. As noted by the State, the trial court could properly determine that Davidson suffered from mental-

---

9. We also note that the trial court made a finding that "Dr. Ouaou never questioned the defendant about the crimes in this case, his feelings about the crimes in this case, or what he was feeling leading up to the crimes in this case." This finding further undermines Davidson's argument that the trial court improperly rejected the mitigator.

health issues to some extent, but nonetheless had the ability to conform his conduct to the requirements of law.

Finally, Davidson's reliance on *Coday v. State,* 946 So. 2d 988 (Fla. 2006), is misplaced. In *Coday,* we found an abuse of discretion in the trial court's rejection of the substantial-impairment mitigator. *Id.* at 1004-05. We noted that six experts testified in support of the mitigator, and the State called no experts to rebut that testimony. *Id.* at 1003-05. Of importance, we stressed, "The evidence offered by the State to counter this mitigation evidence *can be squared* with the expert testimonies." *Id.* at 1005 (emphasis added). Here, in contrast with *Coday,* the State provided evidence that supported rejection of the mitigator, i.e., Davidson's purposeful conduct to conceal his crimes and flee from Welsh's home.

Davidson's second challenge concerns the assignment of little weight to certain nonstatutory mitigating circumstances. According to Davidson, it was arbitrary and unreasonable for the court to assign little weight to his father's abandonment and abusive childhood experiences. Davidson's argument lacks merit.

Here, the trial court found that Davidson's father had indeed abandoned him at a young age, that Davidson (at times) lived with two uncles who were sex offenders—assigning little weight to each circumstance. Davidson did not present evidence establishing a close nexus between this mitigating evidence and his murdering Welsh. *See Bright*, 299 So. 3d at 1008 (finding no abuse of discretion in the trial court's assignment of no weight to the defendant's difficult childhood; stressing that no evidence connected the abuse and neglect with the murders). The mitigating value of the above evidence was less than compelling in other respects. As for living with two sex-offender uncles, there was no evidence that either of them abused Davidson; and the evidence does not disclose the length of time that they actually lived in the same household as Davidson. And, although Davidson's father abandoned him at an early age, Davidson had a good and loving relationship with his mother. Thus, in light of the evidence presented in this case, Davidson has not demonstrated an abuse of discretion. *See Craft*, 312 So. 3d at 53-54.

Davidson points to our decisions in *Morton v. State*, 789 So. 2d 324 (Fla. 2001), and *Douglas v. State*, 878 So. 2d 1246 (Fla. 2004),

but they in no way undermine our analysis. In each case, we found no abuse of discretion in the trial court's assigning little weight to the defendant's childhood abuse or parental abandonment. *See Morton*, 789 So. 2d at 332 (child abuse); *Douglas*, 878 So. 2d at 1260 (parental abandonment). Of significance, neither case states or suggests that long-term abuse or permanent parental abandonment warrant a specific weight; nor does either case limit the discretion of the trial court in assigning weight to such evidence. Indeed, both decisions stress that the weight given to such circumstances is entrusted to the sound discretion of the trial court. *Morton*, 789 So. 2d at 332 ("The weight given to this mitigating circumstance is also within the trial court's discretion." (citing *Shellito v. State*, 701 So. 2d 837, 844 (Fla. 1997))); *Douglas*, 878 So. 2d at 1260 ("[T]he weight given to this mitigating circumstance is within the trial court's discretion."). Thus, *Morton* and *Douglas* do not help Davidson.[10]

---

10. To the extent Davidson also relies on the evidence of his abusive childhood, such reliance is misplaced. As the State properly notes, the trial court gave more than "little weight" to his childhood abuse.

Davidson also attacks the assignment of little weight to portions of his mental-health mitigation. He contends that it was unreasonable for the court to assign little weight to such circumstances based on the fact that it assigned the same weight to his good behavior in court. We reject this argument as inconsistent with our reasoning in *Craft*, 312 So. 3d at 53-54. Specifically, Craft argued, "[T]he weight assigned to the childhood-trauma mitigator was arbitrary and unreasonable because the trial court also assigned the same weight to the mitigating circumstance that Craft exhibited good behavior during trial." *Id.* In rejecting that argument, we observed that the trial court "independently considered and weighed both mitigating circumstances," the "trial court's findings with respect to both circumstances [we]re supported by competent, substantial evidence," and "the trial court did not simply arbitrarily assign all mitigation the same weight." *Id.* at 54.

Here, as reflected in the sentencing order, the trial court gave individualized consideration to each proposed mitigating circumstance and assigned various weight—ranging from none to some—to the mitigating circumstances found to be established.

- 22 -

And Davidson does not claim that the underlying factual findings are not supported by competent, substantial evidence. Thus, *Craft* supports affirmance.

In sum, Davidson has not demonstrated error or an abuse of discretion in the trial court's handling of mitigating circumstances.

## Constitutionality of Prior-Violent-Felony Aggravator

As his final argument, Davidson challenges the constitutionality of the prior-violent-felony aggravator. *See* § 921.141(6)(b), Fla. Stat. Specifically, Davidson argues that the prior-violent-felony aggravator is overbroad and impermissibly vague, thereby constituting cruel and unusual punishment under the state and federal constitutions. Our cases have consistently rejected overbreadth and vagueness challenges to this aggravator. *See, e.g.*, *Bush v. State*, 295 So. 3d 179, 214 (Fla. 2020); *Gonzalez v. State*, 136 So. 3d 1125, 1169 (Fla. 2014); *Lowe v. State*, 2 So. 3d 21, 44 (Fla. 2008); *Hudson v. State*, 708 So. 2d 256, 261 & n.4 (Fla. 1998)). And we see no reason to depart from that case law now.

## Voluntariness of Guilty Plea

In death-penalty cases, "[t]his Court has a mandatory obligation to independently review the sufficiency of the evidence

underlying [a first-degree murder] conviction, and the 'customary review' evaluates whether the conviction is supported by competent, substantial evidence." *Santiago-Gonzalez*, 301 So. 3d at 180 (quoting *Ocha v. State*, 826 So. 2d 956, 965 (Fla. 2002)). "However, where a defendant pleads guilty and waives a jury trial, the relevant inquiry is not whether there was competent, substantial evidence, but whether the defendant knowingly, intelligently, and voluntarily entered the guilty plea." *Id.* (citing *Tanzi v. State*, 964 So. 2d 106, 121 (Fla. 2007)). "Proper review requires this Court to scrutinize the plea to ensure that the defendant was made aware of the consequences of his plea, was apprised of the constitutional rights he was waiving, and ple[aded] guilty voluntarily." *Covington v. State*, 228 So. 3d 49, 67 (Fla. 2017) (alteration in original) (quoting *Ocha*, 826 So. 2d at 965).

Here, as argued by the State, the trial court conducted an extensive inquiry into Davidson's knowledge and understanding of the charges against him, his rights, and the consequences of pleading guilty. Specifically, the trial court apprised Davidson that a guilty plea would mean no guilt-phase trial and the forfeiture of trial-related rights such as requiring the State to prove his guilt

beyond a reasonable doubt, the right to have a jury decide his guilt, the right to be represented by a lawyer at the trial, the right to call and confront witnesses, and the right to remain silent. The court also apprised Davidson that there were only two sentencing options for the first-degree-murder conviction: life in prison or death. And, after being so advised, Davidson told the trial court that he was making the decision to plead guilty "based on [his] own free[] and voluntary will."[11] Finally, the evidence of guilt was overwhelming as detailed in the factual basis given by the prosecutor.

Thus, we conclude that Davidson's guilty plea was voluntarily and knowingly given. *See Craft*, 312 So. 3d at 58; *Santiago-Gonzalez*, 301 So. 3d at 180.

## CONCLUSION

For the reasons given above, we affirm Davidson's first-degree-murder conviction and his sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., concurs in result with an opinion.

---

11. Davidson also signed a written plea form acknowledging the forfeiture of certain trial-related rights and attesting to the voluntary nature of the plea.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

For the reasons expressed in my dissenting opinion in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020) (receding from proportionality review requirement in death penalty direct appeal cases), I can only concur in the result.

An Appeal from the Circuit Court in and for Clay County,
  Don H. Lester, Judge – 102014CF001904000AMX

Jessica Yeary, Public Defender, and Barbara J. Busharis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

  for Appellant

Ashley Moody, Attorney General, and William David Chappell, Assistant Attorney General, Tallahassee, Florida,

  for Appellee